UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Keller Industrial, Inc.,                                File No. 21-cv-2218 (ECT/JFD)

                    Plaintiff,

v.                                                       **OPINION AND ORDER**

Engineering & Construction Innovations,
Inc., Fidelity and Deposit Company of
Maryland, and Zurich American Insurance
Company,

                    Defendants.

---

Kristine A. Kubes and Laurie W. Meyer, Kubes Law Office PLLC, Minneapolis, MN, for Plaintiff Keller Industrial, Inc.

Paul Shapiro, Ernest F. Peake, and Patrick J. Lindmark, Taft Stettinius & Hollister LLP, Minneapolis, MN, for Defendants Engineer & Construction Innovations, Inc., Fidelity and Deposit Company of Maryland, and Zurich American Insurance Company.

---

This diversity case arises out of a January 2021 flood event. Defendant Engineering & Construction Innovations, Inc. ("ECI") was the general contractor on a project to build a water main under the Mississippi River. When ECI's tunneling machine became stuck at the exit shaft, it subcontracted Plaintiff Keller Industrial, Inc. to freeze the ground around the machine to prevent groundwater from entering the area and to enable ECI to retrieve the machine. Keller claimed to do its part, but a few weeks after ECI started working to retrieve the tunneling machine, groundwater flooded the tunnel system. ECI refused to pay Keller for its work. Keller brought this six-count lawsuit, seeking payment for its ground-freeze work. ECI counterclaimed for breach of contract and negligence.

Several motions require a decision: cross-motions for partial summary judgment; ECI's motion to exclude expert testimony, in part, of Keller's three expert witnesses; and Keller's motion to exclude the expert testimony of ECI's engineering expert.  The upshot is this:

- ECI's motion for partial summary judgment will be granted because Keller stipulated to the dismissal of Counts III and IV of the Amended Complaint.

- Keller's motion for partial summary judgment will be denied.

- Keller's motion to exclude the expert testimony of Dr. McGinn will be denied.

- ECI's motion to exclude, in part, the expert testimony of Dr. Auld will be mostly granted.

- ECI's motion to exclude, in part, the expert testimony of Erin Fallon will be granted.

- ECI's motion to exclude, in part, the expert testimony of Paul Wilkinson will be granted in part and denied in part.

I[1]

*The parties.*  ECI is "a full service heavy civil construction firm that specializes in infrastructure, marine, geotechnical and specialty construction projects."  *About ECI*, Engineering & Construction Innovations, Inc., http://eciconstructors.com/about (last visited Jan. 17, 2023).  ECI is incorporated in Minnesota.  Am. Compl. [ECF No. 23] ¶ 2; ECF No. 27 ¶ 2.  Keller "provides solutions to a wide range of geotechnical challenges across the entire construction spectrum."  *Solutions*, Keller https://www.keller-na.com/expertise/solutions (last visited Jan. 17, 2024)  Keller is a New

---

[1]     Unless noted otherwise, the facts described in Part I are undisputed.  *See* Fed. R. Civ. P. 56(a).

Jersey corporation with its principal place of business in New Jersey.  Am. Compl. ¶ 1.

Fidelity and Deposit Company of Maryland's ("Fidelity") state of incorporation and

principal place of business are not clear from the record.[2]  Am. Compl. ¶ 3; ECF No. 26 ¶

3.  Defendant Zurich American Insurance Company ("Zurich") is a New York corporation

with a principal place of business in Illinois.  Am. Compl. ¶ 4; ECF No. 26 ¶ 4.  Fidelity

and Zurich issued a payment bond identifying ECI as the principal.  Am. Compl. ¶ 11; ECF

No. 26 ¶ 11.  Fidelity and Zurich are sureties of that payment bond.  ECF No. 23-1 at 1–2.

*The City of Minneapolis hires ECI to complete a microtunneling project.*  In 2019,

the City hired ECI as the general contractor on the 10th Avenue Water Main River Crossing

Project (the "Project").  ECF No. 62 ¶ 2.  The Project involved the construction of an

underground water main beneath the Mississippi River near downtown Minneapolis.  *Id.*

The City specified that the water main "should be constructed using *microtunneling*."  *Id.*

---

[2]     "[F]ederal courts are obligated to raise the issue of subject-matter jurisdiction *sua sponte*."  *Crawford v. F. Hoffman-La Roche Ltd.*, 267 F.3d 760, 764 n.2 (8th Cir. 2001).  In assessing diversity jurisdiction, other cases observe Fidelity is incorporated in Maryland with its principal place of business in Maryland or Illinois.  *See Bill Goodwin Const., LLC v. Wondra Const., Inc.*, No. 3:13cv157, 2013 WL 4005307, at *2 n.1 (M.D. Pa. Aug. 5, 2013) (concluding Fidelity was incorporated in Maryland with its principal place of business in Illinois); *Fidelity & Deposit Co. of Md. v. Rod Cooke Constr., Inc.*, No. 1:19-CV-241-JB-M, 2020 WL 4342217, at *1 (S.D. Ala. July 28, 2020) ("[Fidelity] is a Maryland company with its principal place of business in Illinois."); *Fidelity & Deposit Co. of Md. v. Willson*, No. 2:06-CV-92, 2006 WL 3086945, at *1 (N.D. Ind. Oct. 26, 2006) ("[Fidelity] is a citizen of Maryland, both being organized under the laws of Maryland and having its principal place of business there.").  *But see Fidelity & Deposit Co. of Md. v. Omni Constr. Co., Inc.*, No. 19-CV-49, 2020 WL 1975790, at *1 n.1 (N.D. Ohio Apr. 24, 2020) ("[Fidelity] is a corporation organized and existing under the laws of the State of Illinois with its principal place of business in Illinois.").  Because Keller is a New Jersey corporation with its principal place of business in New Jersey, diversity jurisdiction is satisfied.

¶ 4.  A launch shaft and retrieval shaft were constructed, the launch shaft located on the east bank of the Mississippi River and the retrieval shaft located on the west bank.  *Id.* ¶ 5; ECF No. 90-1 at 307 (Marshall Dep. 55:12–14).  A "microtunnel boring machine (the 'MTBM'), shaped like a horizontal cylinder, was lowered into the launch shaft."  ECF No. 62 ¶ 5.  "The 'head' of the MTBM, a five-foot-diameter cutting tool, was oriented to face the direction of tunneling."  *Id.*  Hydraulic jacks pushed the MTBM through the ground. *Id.*  The MTBM broke down the subsurface and the subsurface material was pumped out of the tunnel system.  *Id.*  As the MTBM advanced underground from the launch shaft to the retrieval shaft, "the hydraulic jacks were periodically retracted, and a twenty-foot section of encased piping was installed behind the MTBM."  *Id.* ¶ 6.  In theory, the process would repeat until the MTBM reached the retrieval shaft, leaving behind a completed, encased pipeline.  *Id.*  The following schematic illustrates the Project:



*Id.* ¶ 7.

*ECI initially hires a subcontractor to microtunnel, before taking over the process.* ECI hired Bradshaw Construction Corporation ("Bradshaw"), "a microtunneling specialty contractor, to perform the Project's microtunneling" work. *Id.* ¶ 8. Bradshaw started microtunneling in November 2019. *Id.* For reasons unclear from the record, Bradshaw encountered problems and only advanced its MTBM a short distance in three months. *Id.* In February 2020, "ECI terminated Bradshaw at the direction of the City." *Id.* ECI later submitted a proposal to self-perform the microtunneling work and started microtunneling in early August 2020. *Id.* ¶¶ 9–10.

*The MTBM gets stuck.* Within two weeks, the MTBM's head reached the retrieval shaft, "[b]ut ECI was unable to advance its MTBM into the retrieval shaft so that it could be recovered and extracted." *Id.* ¶ 10. A reception seal had been installed in the retrieval shaft to receive the MTBM, ECF No. 90-1 at 105, but the MTBM arrived off-center and was stuck at the reception seal, *id.* at 212 (Umlauf Dep. 120:13–15), 302 (Marshall Dep. 33:3–15). Because the retrieval shaft was sealed from the subsurface, *see id.* at 103–104, forcing the MTBM into the retrieval shaft risked groundwater intrusions into the tunnel system.

*The dirt wing problem.* The MTBM had "an antiroll fin or steering fin . . . that helped stabilize the machine." ECF No. 90-1 at 137 (Johnson Dep. 95:14–16). The parties refer to this steering fin as the dirt wing. *See, e.g.*, *id.* at 137 (Johnson Dep. 95:25–96:3). The dirt wing was designed to be retractable, but when the MTBM reached the retrieval shaft it would not retract. *Id.* at 137 (Johnson Dep. 95:8–20). This dirt wing contributed to the MTBM being stuck at the reception seal system, unable to advance further into the

retrieval shaft.  *Id.*; *see also id.* at 318 (Marshall Dep. 100:7–14) ("if we were to try to push through our seal, it would tear the seal was our fear.  So the goal was to try to extract the dirt wing to further advance the MTBM.").  In August 2020, ECI attempted to remove the dirt wing, resulting in groundwater inflows into the MTBM.  *Id.* at 202 (Umlauf Dep. 78:15–19), 258 (Hogen Dep. 88:7–12).  In August and early September 2020, while attempting to remove the dirt wing and stop groundwater inflows, ECI placed grout around the MTBM.  *Id.* at 338 (Marshall Dep. 179:4–21), 259 (Hogen Dep. 89:3–14).

*ECI subcontracts Keller to freeze the ground.*  To resolve these problems, ECI contracted Keller to design and install a "ground-freeze system in the area around the MTBM and the retrieval shaft."  ECF No. 62 ¶ 11.  "The idea was that freezing the subsurface would enable ECI personnel to perform additional work . . . to advance the MTBM into the retrieval shaft" without groundwater or soil flowing into the tunnel system. *Id.*  Keller created a preliminary ground-freeze design, ECF No. 90-1 at 30 (Sopko Dep. 47:16–21), drafted a ground-freezing proposal, and on October 6, 2021, sent a revised ground-freezing proposal to ECI.  ECF No. 62-1 at 20–25.  On October 12, 2021, Keller and ECI executed a subcontractor agreement (the "Subcontract") for Keller to design, furnish, and install a "frozen soil system for temporary ground stabilization and ground water control."  *Id.* at 13, 20.  Keller's responsibilities included "[t]he installation and oversight of the ground freeze system in accordance with [Keller's] proposal dated October 6, 2020."  *Id.* at 13.  ECI was responsible for furnishing, drilling, and installing the ground-freeze pipe described more fully in the next paragraph.  *Id.*

*Keller's ground-freeze design.*   Keller's ground-freeze design included several components.  Keller proposed installing 30 freeze pipes drilled to 120 feet deep.  ECF No. 90-1 at 7.  Freeze pipes are steel pipes drilled into the ground.  ECF No. 90-1 at 194 (Umlauf Dep. 45:3–4).  The freeze pipes are then connected to a freeze plant, which cools and circulates liquid brine through the freeze pipes.  ECF No. 90-1 at 52 (Sopko Dep. 139:6–11), 8.  Over time, as the chilled liquid brine circulates through the freeze pipes, heat is extracted from the surrounding earth, lowering the ground temperature around the freeze pipes.  *Id.* at 6.  The goal of lowering the ground temperature is to form a frozen mass.  *Id.* at 48 (Sopko Dep. 122:19–23).  Here, the frozen mass was to be formed around the MTBM and retrieval shaft.  *Id.*  Various temperature sensors would monitor the freeze.  Temperature monitoring pipes are pipes drilled into the ground, filled with calcium chloride brine.  *Id.* at 50 (Sopko Dep. 132:1–12).  A beadedstream is installed in the temperature monitoring pipes—a wire with temperature sensors reporting data at different depths along the pipe.  *Id.* at 50 (Sopko Dep. 132:1–133:25), 51 (Sopko Dep. 134:17–135:1).  The beadedstreams are connected to an instrumentation panel, or control panel, located at the site of the Project.  *Id.* at 34 (Sopko Dep. 67:8–14).  A temperature sensor measures the brine temperature as it returns from the freeze pipes to the freeze plant.  *Id.* at 52 (Sopko Dep. 139:6–11).  Finally, Keller proposed monitoring the ground temperature from inside the MTBM "using a portable magnetic datalogger."  *Id.* at 4.

*Installation of the ground-freeze and temperature monitoring pipes.*   On the west bank of the Mississippi River, Keller set up the ground-freeze system around the retrieval shaft and MTBM in November 2020.  ECF No. 62 ¶ 13.  Keller selected the physical

locations to install the freeze pipes, incorporating existing freeze pipes near the shaft into the design. ECF No. 90-1 at 47 (Sopko Dep. 120:7–121:10).[3] "ECI drilled temporary case holes at locations and depth as determined by Keller's design, and then installed the steel freeze pipe in the . . . temporary case drilled hole[s] . . . and retracted the temporary casing." *Id.* at 194 (Umlauf Dep. 45:1–5). Keller determined the number and location of temperature monitoring pipes. *Id.* at 51 (Sopko Dep. 135:2–10). The portable datalogger was initially installed in the MTBM, *see id.* at 56 (Sopko Dep. 154:2–5), but at some point after January 3, 2021, it was removed, ECF No. 88-1 at 246 (McGinn Dep. 245:5–11), 260 (259:19–25).

*Initiating the freeze.* In early December 2020, Keller turned the ground-freeze system on. ECF No. 62 ¶ 13. Over the course of December, Keller compared the temperatures measured by its temperature sensors with temperatures predicted by "an as-built model," meaning a model based on measured datapoints such as the locations of the freeze pipes, temperature pipes, and the temperature of the brine circulating through the freeze pipes. ECF No. 90-1 at 58 (Sopko Dep. 165:4–24). At some point, Keller determined the frozen mass had been formed based on temperature readings and visual observations. *Id.* at 55–56 (Sopko Dep. 153:19–154:16). On January 3, 2021, Keller sent an "Authorization to Excavate" to ECI, informing ECI that excavation and recovery of the MTBM could begin with two qualifications. ECF No. 62-1 at 27. First, cutting and

---

[3]     A different freezing contractor had performed a freeze around the retrieval shaft when ECI installed the reception seal. ECF No. 90-1 at 47 (Sopko Dep. 120:19–24). Some of the freeze pipes installed by the previous freezing contractor had been left in place.

welding could not exceed one shift per day (or less if activities resulted in excessive melting). *Id.* Second, any groundwater or soil inflows were to be reported to the onsite Keller representative immediately. *Id.*

*ECI starts MTBM recovery operations.* After receiving Keller's authorization, ECI started working in the shaft and tunnel to recover the MTBM. One of the first steps taken by ECI was debris removal. ECF No. 90-1 at 109. On January 7, 2021, ECI personnel observed an inward deflection, or bulge, in the steel skin of the MTBM. *Id.* at 109, 283 (Hogen Dep. 186:22–187:7). ECI measured the deflection at 48 inches by 20 inches and 4 inches deep. *Id.* at 283 (Hogen Dep. 188:7–15), 109. There was concern this inward deflection acted "as a pinch point," making it more difficult for the MTBM to be pushed into the retrieval shaft. *Id.* at 286 (Hogen Dep. 197:22–23).

*ECI's attempt to jack the MTBM into the retrieval shaft is unsuccessful.* In early January, the pipe running under the Mississippi River was connected to the MTBM by a trailing can. ECF No. 90-1 at 331 (Marshall Dep. 151:1–14). ECI installed three hydraulic jacks near the joint where the trailing can of the MTBM connected to the pipe. *Id.* (Marshall Dep. 150:18–24). The hydraulic jacks were placed to push the MTBM forward into the retrieval shaft. ECF No. 90-1 at 107. In early January, ECI made two cuts to facilitate the push. First, on January 11, 2021, ECI made a circumferential cut (a 360-degree cut) in the pipe directly behind the MTBM's trailing can.[4] ECF No. 90-1 at 325 (Marshall Dep. 127:5–11). The cut was made to disconnect the MTBM from the pipe

---

[4]     The circumferential cut was made, verified, then expanded. *See* ECF No. 90-1 at 106–07. It is not clear if all this work occurred on January 11, 2021.

running under the Mississippi River so the hydraulic jacks could push the MTBM into the retrieval shaft. *Id.* at 325 (Marshall Dep. 128:16–21). ECI performed the cut with a "grinder/cutting wheel" and a carbon air arc. *Id.* at 107. Second, ECI made a relief cut in the top of the MTBM to relieve the inward deflection. *Id.* at 286 (Hogen Dep. 197:12–23). ECI tried to jack the MTBM into the retrieval shaft without success. *Id.* at 300 (Marshall Dep. 25:19–26:5).

*ECI continues efforts to push the MTBM into the retrieval shaft.* ECI attempted to remove the reception seal to clear the MTBM's path into the retrieval shaft. ECF No. 90-1 at 303 (Marshall Dep. 40:15–41:1). Removing the seal proved difficult, *id.* at 272 (Hogen Dep. 144:13–18), and ECI performed grinding, cutting, and torching work to remove parts of the seal. *See id.* at 301 (Marshall Dep. 31:20–32:12); 303–04 (Marshall Dep. 40:22–41:1, 42:11–43:2). There was also concern that the MTBM was frozen to the subsurface. *Id.* at 77 (Sopko Dep. 241:4–13). To facilitate removal of the MTBM, freeze pipes near the reception seal were turned off. *Id.* at 220 (Umlauf Dep. 151:23–152:21). ECI also ran heaters near the MTBM during off-shift hours (roughly 14 hours a day). *Id.* at 108. One heater was located in the retrieval shaft, pointed toward the MTBM, while a second heater was located near the joint between the trailing can and pipe, pointed toward the MTBM from the other direction. *Id.* at 108. ECI ran the heaters to break, or weaken, the bond between the MTBM and the frozen subsurface. *Id.* at 156 (Johnson Dep. 172:12–24). ECI used poly sheeting to insulate the heaters, keeping the heat contained around the MTBM instead of diffusing down the tunnel or up the retrieval shaft. *Id.* at 108; 157 (Johnson Dep.

176:5–20).[5]  Despite these efforts, ECI's additional jacking attempts were unsuccessful. *See, e.g.*, *id.* at 303 (Marshall Dep. 40:22–25).  To provide additional jacking force, ECI planned to install a fourth hydraulic jack in the tunnel.  *Id.* at 332 (Marshall Dep. 153:5–11).

*The tunnel and shafts flood.*  When ECI personnel arrived at the site of the Project on January 21, 2021, they found the launch shaft, retrieval shaft, and tunnel flooded.  ECF No. 90-1 at 308 (Marshall Dep. 57:8–58:6).  Pumping tests were performed on both shafts to confirm groundwater was continuously entering the tunnel system.  *Id.* at 109.  ECI engaged divers to investigate the flooding, who determined groundwater was flowing into the tunnel network from inside the MTBM.  *Id.* at 109, 309 (Marshall Dep. 63:9–24).[6] Shortly after the flood event, ECI started withholding payments from Keller.  ECF No. 62 ¶ 17.  ECI never advanced the MTBM into the retrieval shaft.  *Id.* ¶16.  Instead, "ECI gutted the interior of the MTBM and left its outer casing in place as the last 'section' of tunnel used to house the water main."  *Id.*

*The lawsuit.*  Keller filed the operative six-count Amended Complaint on December 1, 2021.  Am. Compl.  Count I is a claim on the surety bond against Fidelity and Zurich. *Id.* ¶¶ 35–44.  Count II is a breach-of-contract claim against ECI.  *Id.* ¶¶ 45–53.  Count III is a violation of the Minnesota Prompt Payment Statute, Minn. Stat. § 337.10, against ECI.

---

[5]     The parties dispute whether the insulation successfully contained heat within the MTBM.

[6]     In part, water and sediment flowed through the circumferential cut.  ECF No. 90-1 at 83 (Sopko Dep. 263:8–20).

*Id.* ¶¶ 54–62.  Count IV is a claim under Minnesota's Mechanic's Lien Statute, Minn. Stat.

§ 514.02, against ECI.  *Id.* ¶¶ 63–70.  Count V is a claim of account stated against ECI.  *Id.*

¶¶ 71–77.  Count VI is a claim for contractual costs, expenses, and attorneys' fees, against

ECI.  *Id.* ¶¶ 78–79.  ECI filed its Answer and Counterclaims on December 13, 2021.  ECF

No. 27.  ECI brings two counterclaims.  *Id.*  Count I is for breach of contract, *id.* ¶¶ 37–42,

and Count II is negligence, *id.* ¶¶ 43–50.  The parties' motions follow the end of discovery.

II

Summary judgment is warranted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  A fact is "material" only if its resolution might affect the outcome

of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The evidence of the

non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor."

*Id.* at 255 (citation omitted).  A "smoking gun" is not required for the non-movant to defeat

a summary judgment motion.  *Teleconnect Co. v. Ensrud*, 55 F.3d 357, 360 (8th Cir. 1995).

But the non-movant must show "more than mere speculation, conjecture, or fantasy."  *Clay

v. Credit Bureau Enters., Inc.*, 754 F.3d 535, 539 (8th Cir. 2014) (citation and quotations

omitted); *Zayed v. Associated Bank, N.A.*, 913 F.3d 709, 714 (8th Cir. 2019).

A

Keller seeks summary judgment as a matter of law that ECI is not entitled to any

delay-related damages.  ECF No. 66 at 5.  The Subcontract only allows ECI to recover

12

delay-related damages from Keller for damages arising from "defective or malfunctioning equipment provided by Keller and directly employed in the ground freezing operation." ECF No. 89 at 7 (quoting ECF No. 62-1 at 15). Keller argues there is no evidence in the record that its equipment malfunctioned or was defective. ECF No. 66 at 11. ECI does not dispute Keller's interpretation of the Subcontract, ECF No. 89 at 3, but ECI opposes summary judgment on two grounds.

First, ECI argues, "at summary judgment, the moving party must present competent, admissible evidence—and because Keller failed to do that here, summary judgment is improper." ECF No. 89 at 6. ECI contends that Keller has failed to provide competent, admissible evidence because "Keller's motion rests entirely on an attorney affidavit (where the affiant has no actual, firsthand knowledge) riddled with hearsay and foundation problems." *Id.* This critique misses the mark—a movant's initial burden at summary judgment depends on which party bears the burden of proof at trial. After discovery, a movant will be entitled to summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). As the Supreme Court explained in *Celotex*, the movant's burden "may be discharged by 'showing'–that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. "[T]his initial burden on the movant is 'far from stringent' and 'regularly discharged with ease.'" *Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018) (quoting *St. Jude Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587, 596 (8th Cir. 2001)). "In other words, if the nonmoving party must

prove *X* to prevail, the moving party at summary judgment can either produce evidence that *X* is not so or point out that the nonmoving party lacks the evidence to prove *X*." *Id.* at 996–97.

ECI has the burden of proof at trial because Keller seeks partial summary judgment against the delay-related damages component of ECI's breach-of-contract counterclaim. Because ECI has the burden of proof at trial, Keller is not required to affirmatively produce evidence that Keller's ground-freeze equipment did not malfunction. Rather, it may move for summary judgment by pointing out ECI lacks the evidence to prove that Keller's equipment malfunctioned or was defective. ECI, as the nonmoving party, must then demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Anderson*, 477 U.S at 256.

Second, ECI claims there is a genuine issue of material fact whether Keller's temperature-monitoring equipment malfunctioned. This issue presents a close call. Although ECI contends "the record is replete with evidence showing that Keller's equipment was defective or malfunctioning," the only "non-exhaustive" example relates to Keller's temperature-monitoring equipment. ECF No. 89 at 14–20. Without direct evidence of temperature-monitoring equipment malfunctions, ECI relies on circumstantial evidence.

(A) ECI starts by claiming "Keller's design proposal predicted that it would take between six and eight weeks for the freeze to form, at which time ECI could begin excavating and recovering the MTBM." ECF No. 89 at 15. It further cites to a deposition of Joseph Sopko, Keller's director of ground freezing, as follows:

> Q: So in other words, this means, once you turn the freeze system on, Keller's estimating that it will take six to eight weeks for the freeze to reach the point where ECI can begin undertaking to complete its microtunneling activities, right?
>
> A: Right.

*Id.*  However, by late December, after the ground-freeze system was running for roughly four weeks, Keller concluded the freeze was sufficient for ECI to start recovery efforts. ECF No. 90-1 at 85 (Sopko Dep. 272:16–273:4).  According to ECI, this is circumstantial evidence the beadedstreams in the temperature monitoring pipes were reporting colder than actual temperatures, and thus malfunctioning by transmitting inaccurate data.  ECF No. 89 at 16.

There is some contrary evidence in the record.  Although the proposal states, "the following sequence will occur . . . [i]nitiate freezing for six to eight weeks," ECF No. 90-1 at 4, the proposal later notes that "the frozen mass will be formed in approximately 28 days" *id.* at 6.  In his deposition, Sopko addressed this discrepancy:

> Q: Why did you select six to eight weeks as the appropriate time frame for the freeze?
>
> A: Well, if you would look at the model that we were just showing, it was really frozen in 28 days, or six weeks would be 42 days.  But because this always ends up in a, you know, contractual issue, that that's six – the 28 freeze days are days of, you know, plant operating completely.  We always add extra time, particularly in a job where there's going to be generator power.  You – you know, you're going to have – you need 28 really nice, cold freezing days, but we like to put that in there because there are things that – that could delay the freeze.
>
> . . .
>
> Q: So sort of in short, while you – your model says it only will take 28 freeze days for the freeze formation to be satisfactory to you –
>
> A: Uh-huh.

Q:-- you built in a little bit of cushion, just out of an abundance of caution, and freeze it for a bit longer, is that right?

A: Contingency.

ECF No. 90-1 at 49–50, (Sopko Dep. 129:2–130:8). Sopko testified these delays "didn't happen on this job." *Id.* at 50 (Sopko Dep. 130:19–20). However, when explaining the January 3, 2021, authorization to excavate, Sopko testified the full six to eight weeks was not required because "[t]he freeze froze faster than the [design] model," *id.* at 85 (Sopko Dep. 273:9–13), and because "the measured temperatures were a lot colder than we anticipated." *Id.* (Sopko Dep. 273:19–20). Viewing the facts in the light most favorable to the nonmoving party, it is necessary to accept that the ground froze faster than the model predicted.[7] This circumstantial evidence somewhat supports an inference that the beadedstreams in the temperature monitoring pipes were malfunctioning.

(B) Next, ECI argues the failure for the flood event to register on Keller's temperature monitoring pipes is evidence the sensors were not transmitting accurate data. ECI contends "although water (which, by definition, is above freezing temperature) was present in the tunnel and throughout the freeze zone, Keller's temperature-monitoring equipment registered no changes." ECF No. 89 at 17. Because the entry point for the groundwater was within the proximity to the MTBM, within the freeze zone, ECI claims the failure for the temperature-sensors in the temperature monitoring pipes to record

---

[7]    It is not clear from the record how Keller's measured temperatures compared to the as-built model.

increased temperatures demonstrates that the temperature sensors were defective or malfunctioning.  *See id.* at 18.

There is a question whether the temperature monitoring pipes should have recorded a substantial change in temperature before or during the flood event.   In Sopko's deposition, he testified the temperature monitoring pipes "measure the temperature right where they are.  They can't measure outside of it."   ECF No. 90-1 at 52 (Sopko Dep. 138:13–14).  When asked about warm water flowing through voids in the freeze zone, Sopko testified temperature monitoring pipes would pick up the void "if [the temperature monitoring pipes] happen to be in the location of the void, sure."  *Id.* at 87 (Sopko Dep. 280:12–13).  But there is contrary evidence in the record that the temperature monitoring pipes should have detected a breach inside the frozen mass.  Keller initially was convinced the breach was not in the freeze zone because Keller's temperature-monitoring equipment did not report significant changes in temperature.  *Id.* at 80–81 (Sopko Dep. 253:19–254:21).  In particular, Sopko testified in his deposition that he would have expected a breach in the frozen mass to show up in the data transmitted by the temperature monitoring pipes.  *Id.* at 80–81 (Sopko Dep. 253:19–254:21).  And viewing the facts in the light most favorable to ECI, the breach occurred within the freeze zone.  *See, e.g.*, *id.* at 81 (Sopko Dep. 256:17–257:11).  Moreover, there is some evidence of a void (empty space left by subsurface eroding into the tunnel system) near a temperature monitoring pipe.  *Id.* at 83 (Sopko Dep. 263:8–264:9).  This is circumstantial evidence that Keller's beadedstreams in its temperature monitoring pipes malfunctioned.

(C) Finally, ECI argues "Keller's temperature-monitoring equipment wasn't working properly because its internal sensors were frozen in place, causing them to transmit inaccurate data about ground temperatures within the so-called 'freeze zone.'" ECF No. 89 at 14. To support this theory, ECI provides three emails and a paragraph in an affidavit. ECF No. 91 ¶ 3; *see also* ECF No. 91-1 at 2. On June 2, 2021, an ECI employee emailed Keller stating "there is [sic] apparently some issues with removing some of the temperature pipes that are frozen in? Not sure why they are frozen in." ECF No. 91-1 at 2. A Keller employee responded the same day, explaining "[w]e are not sure what the issue is. Its [sic] possible that freshwater got into the top of the pipes and froze on the surface. . . . Our plan is to drop a pipe down the temperature monitor and circulate hydrant water to attempt to melt the ice (if its [sic] ice) within the temperature pipe. We would only be using this to free up maybe the top 10-feet. If the blockage is below this, this method wont [sic] be enough." *Id.* at 2.

To start, there is contradictory evidence in the record whether frozen temperature monitoring pipes would transmit inaccurate data. Sopko testified frozen water in the temperature monitoring pipes would not impact recorded temperatures:

Q: Okay. And do you ever use water in the temperature monitoring pipes as the liquid?

A: Not on purpose. There's been times – you could. There's been times where surface flooding has flooded pipes. You'd get the same data. But when you put – if you did put water in, you know, it would freeze, which is fine, you get data. Just if you ever have to pull out your temperature string or anything it would be a lot harder.

Q: So you'd get the same data from a temperature monitoring pipe that is filled with this calcium chloride brine as you would from a temperature monitoring pipe that is

18

filled with frozen water?

A: Yes.

Q: Okay.

A: Yeah, I've filled them with sand in some cases too.

Q: Okay.  Doesn't the thing that's within the temperature monitoring pipe affect at all the thermistor's ability to read ground temperatures?

A: No.

ECF No. 90-1 at 59 (Sopko Dep. 166:8–167:4).  However, ECI's expert, Dr. Arthur McGinn, opined "a frozen brine solution in a TMP would register with a false positive that the formation was fully established and maintained, thereby inaccurately conveying that it was safe for ECI personnel to engage in construction activities in the retrieval shaft and in the tunnel."  ECF No. 74-1 at 864.  At this stage, viewing the facts in ECI's favor, it is reasonable to conclude that frozen temperature monitoring pipes would transmit inaccurate data.

Regardless, the link between these emails and the flood event is tenuous.  The emails and affidavit demonstrate that the temperature monitoring pipes were frozen in June 2021.  But this evidence does little to show the temperature monitoring pipes were frozen months earlier in December 2020 or January 2021, before the flood event occurred.  And the emails convey a lack of certainty about the problem.  Statements such as "[the pipes are] not supposed to be like that at all," and "[w]e are not sure what the issue is.  Its [sic] possible that freshwater got into the top of the pipes and froze on the surface," do little to suggest the problem is months old.  Without more evidence, it is difficult to infer the temperature

monitoring pipes froze before the flood event.  Even when considered in conjunction with ECI's other circumstantial evidence, ECI's evidence that the temperature monitoring pipes were frozen in June 2021 is at best weak circumstantial evidence the temperature monitoring pipes were frozen (and thus malfunctioned by transmitting inaccurate data) prior to the flood event.

Nonetheless, taken collectively, accepting all of ECI's evidence as true, and drawing all justifiable inferences in its favor, Keller's motion for summary judgment will be denied. There is no dispute the beadedstreams were equipment provided by Keller and directly employed in the ground freezing operation.  And with the summary-judgment standard in mind, ECI presented facts showing: (1) the beadedstreams in the temperature monitoring pipes reported data indicating the freeze formed faster than expected; (2) if properly functioning the beadedstreams would detect a flood event within the freeze zone; (3) the groundwater and soil flowed into the MTBM from within the freeze zone; (4) the temperature monitoring pipes did not detect the flood event; and (5) the beadedstreams may have transmitted lower than actual temperatures because the temperature monitoring pipes were frozen.[8]  Because this is enough for a reasonable factfinder to conclude Keller's

---

[8]     It is worth noting ECI's theory raises several questions.  There are multiple temperature monitoring pipes with beadedstreams containing temperature sensors at different depths.  Is ECI suggesting all of the sensors on all of the beadedstreams were reporting lower than actual temperatures?  If not all of the sensors, which ones, and why is there no evidence of discrepancies between temperature readings in the record?  What about the temperature sensor monitoring the returning brine from the freeze pipes and the portable datalogger in the MTBM, were those sensors also reporting lower than actual temperatures?  But such questions about ECI's theory are better resolved at trial with the benefit of a complete factual record, cross examination, and the ability to resolve disputed facts.

temperature-monitoring equipment malfunctioned, genuine issues of material fact remain for trial.

B

Keller also seeks summary judgment on ECI's "liquidated damages claim."[9]  Keller argues "summary judgment is proper because ECI has not yet been damaged by the mere threat of the imposition of liquidated damages."  ECF No. 66 at 13.  Because ECI has not yet paid liquidated damages to the City, Keller contends the "damages are, therefore, speculative, and unrecoverable under the law."  ECF No. 66 at 15.

Keller is correct that contractual damages may not be "speculative, remote, or conjectural."  *Bollom v. Brunswick Corp.*, 453 F. Supp. 3d 1206, 1222 (D. Minn. 2020).  But it is necessary to start with the elements of breach of contract.  Under Minnesota law, a breach-of-contract claim requires: "(1) a valid contract; (2) performance by the plaintiff of any conditions precedent; (3) a material breach of the contract by the defendant; and (4) damages."  *Russo v. NCS Pearson, Inc.*, 462 F. Supp. 2d 981, 989 (D. Minn. 2006) (citation omitted); *see Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011) (same).  Keller's objection relates to the damages element of ECI's breach-of-contract claim.  "In order to survive summary judgment, [ECI] must raise a genuine issue of material fact

---

[9]      This issue deserves clarification.  ECI brought two claims: negligence and breach of contract.  ECF No. 27 ¶¶ 37–50.  ECI did not bring a separate claim for liquidated damages, nor is it seeking liquidated damages from Keller.  *See generally id.*  A contract between the City and ECI "set liquidated damages for delay in the amount of $5,000 for each day that expires after the date set for substantial completion."  ECF No. 75-1 at 20.  ECI alleges Keller's breach of contract and negligence caused the flood event, which resulted in delays to the Project.  ECF No. 27 ¶ 36.  Thus, ECI seeks to recover (from Keller) a portion of the liquidated damages it will pay to the City.

21

regarding whether [Keller's] alleged breach of the [contract] caused [it] damages." *Bollom*, 453 F. Supp. 3d at 1221.   In *Bollom*, for example, the court granted summary judgment because "[a]ny calculation of a particular amount of general damages would be wholly speculative."   *Id.* at 1222.   By contrast, Keller contends only some of ECI's damages are speculative.   Because Keller does not dispute ECI incurred monetary damage from the flooding to a reasonable level of certainty, the fourth element of ECI's breach of contract claim is satisfied.[10]

Even if Keller could challenge a subset of ECI's damages as speculative at summary judgment, there is a genuine issue of material fact as to the certainty of ECI's damages. Although Keller contends ECI has not yet incurred any liquidated damages, ECF No. 66 at 14, a reasonable factfinder could conclude that the exact amount of liquidated damages ECI owes to the City is known—$2,815,000.   ECF No. 75-1 at 20.   In turn, ECI's scheduling expert attributes 96 days of delay, amounting to $480,000 of liquidated damages, to Keller.   ECF No. 66 at 14.   And in the context of standing and ripeness in a related case, Judge Wright explained why this specific amount is sufficiently certain:

> ECI's claim for liquidated damages does not rest on the contingent future event that it might owe the City the liquidated damages.   *See HCIC Enterprises, LLC v. United States*, 149 Fed. Cl. 297, 302 (2020) (Federal Claims Court concluding a claim is not ripe when liquidated damages have yet to be assessed).   The Prime Contract provides that ECI shall pay liquidated damages in the event of a delay.   It is undisputed that the City assessed liquidated damages against ECI and is requesting payment.   As the liquidated damages have been assessed, the injury to ECI is "certainly impending." *Paraquad, Inc.*, 259 F.3d at 958.   Additionally, Defendants

---

[10]   The same conclusion follows for ECI's negligence claim.

lack any legal support for their argument that a party must collect the liquidated damages before standing can be established.  The amount of liquidated damages to the City is known and owed.

*Eng'g & Constr. Innovations, Inc. v. Bradshaw Constr. Corp.*, No. 20-cv-0808 (WMW/TNL), 2023 WL 6217994, at *10 (D. Minn. Sept. 25, 2023).  In short, a reasonable factfinder could conclude the challenged damages are sufficiently certain.

III

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony.  That rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  "District courts have wide latitude in determining whether an expert's testimony is reliable."  *Olson v. Ford Motor Co.*, 481 F.3d 619, 626 (8th Cir. 2007).  The Eighth Circuit has identified a number of factors courts may consider in determining whether an expert's testimony is the product of "reliable principles and methods," including:

> (1) whether the theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the theory or technique has a known or potential error rate and standards controlling the technique's operation; and (4) whether the theory or technique is generally accepted in the scientific community.

*Smith v. Cangieter*, 462 F.3d 920, 923 (8th Cir. 2006). "This evidentiary inquiry is meant to be flexible and fact specific, and a court should use, adapt, or reject *Daubert* factors as the particular case demands." *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005). As long as the evidence indicates that the expert evidence is reliable and relevant, "no single requirement for admissibility" governs. *Id.* "The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence." *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001); Fed. R. Evid. 702. "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (quotation omitted). But the court must exclude an expert's opinion if it "is so fundamentally unsupported that it can offer no assistance to the jury." *Id.* at 929–30 (quotation omitted). "Expert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006). Furthermore, "under *Daubert* and Rule 403 of the Federal Rules of Evidence, the probative value of the expert testimony must not be substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury." *United States v. Solorio-Tafolla*, 324 F.3d 964, 966 (8th Cir. 2003).

A

Keller moves to exclude the testimony of ECI's engineering expert, Dr. Arthur McGinn.  ECF No. 77.  Dr. McGinn holds a M.S. and B.S. in Civil Engineering from Purdue University, and a Ph.D. in Geotechnical Engineering from Cornell University.  ECF No. 74-1 at 869.  He is a licensed Professional Engineer with expertise as a civil engineer in the geotechnical and structural design of excavation support systems for tunnels, underpinning systems, and foundations.  *Id.* at 840, 869.  He has ten publications on soil stabilization, *id.* at 891–92, and over 25 years of civil engineering experience, *id.* at 869.  Dr. McGinn is currently the president and CEO of Brierley, a civil engineering firm that "specializes in the design and construction of tunnels and heavy civil projects for water, wastewater, transportation, and other infrastructure."  *Id.* at 839, 869.

Dr. McGinn offers five opinions in his report: (1) that Keller breached professional engineering standards by failing to consider ECI's MTBM extraction methods when designing the ground-freeze (and failing to modify the design after becoming aware of ECI's methods), ECF No. 74-1 at 837; (2) Keller breached professional engineering standards by "failing to verify the effectiveness of the temperature monitoring points," *id.*; (3) Keller breached professional engineering standards by failing to verify the effectiveness of the ground-freeze via proven methods, *id.* at 837–38; (4) the frozen mass failed to fully form in advance of ECI's work on the project, and Keller's temperature monitoring program was "incapable of detecting the actual temperatures within the ground and groundwater" around the MTBM, *id.* at 838; and (5) Keller breached professional engineering standards by relying on unverified data to substantiate its model, "failing to

25

recognize the as-built temperatures were not as Keller assumed," and removing the datalogger from the MTBM, *id.*

Keller acknowledges Dr. McGinn qualifies to testify as a tunneling expert, but contends he is not qualified as a ground-freeze expert, arguing "only an engineer practicing in the same field at the same time can opine on whether Keller has met its standard of care." ECF No. 92 at 5. Because Dr. McGinn lacks specialized knowledge, education, or experience working on ground-freeze systems, Keller asserts he is unqualified to "render *any* opinions or testimony in this case." *Id.* at 6. It is true that even when a witness has specialized knowledge, "qualification to testify as an expert also requires that the area of the witness's competence matches the subject matter of the witness's testimony." 29 Charles A. Wright & Victor J. Gold, *Federal Practice and Procedure: Evidence* § 6264.2 (2d ed. Apr. 2023 Update). According to this principle, "courts will prevent a witness from testifying as an expert where the witness has specialized knowledge on one subject but offers to testify on a different subject." *Id.* For example, a hydrologist specializing in flood risk management qualified as an expert under Rule 702 but lacked the expertise to testify about safe warehousing practices to protect steel from floods. *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715–16 (8th Cir. 2001). Likewise, an expert in metallurgy could not testify about the lung's ability to absorb manganese from welding fumes, *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 723–24 (7th Cir. 1999), and an expert appraiser could offer an expert opinion on the value of an antique item but not that a clock originated from a particular historical period, *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 78–79 (1st Cir. 2006).

But Keller discounts Dr. McGinn's qualifications as a geotechnical and civil engineer. An expert with more generalized knowledge in a field can typically testify even if they are not a specialist. 29 Charles A. Wright & Victor J. Gold, *Federal Practice and Procedure: Evidence* § 6264.2 (2d ed. Apr. 2023 Update). For example, In *Southern Minnesota Beet Sugar Cooperative v. Agriculture Systems*, the court found a mechanical engineer was qualified to opine on the alleged negligent design of sugar-storage silos despite the expert lacking specific education or experience regarding silo reclaimer systems. No. 17-cv-5552 (WMW/BRT), 2020 WL 5105763, at *4 (D. Minn. Aug. 31, 2020). The court concluded the mechanical engineer "qualifies as an expert regarding the mechanical engineering applicable to the reclaimer system." *Id.* By the same virtue, Dr. McGinn qualifies as an expert regarding the geotechnical and civil engineering principles applicable to Keller's ground-freeze operations. ECI has adequately demonstrated that geotechnical engineering is a subfield of civil engineering, and ground-freezing is at most a specialty within the subfield of geotechnical engineering. *Robinson v. GEICO General Insurance Co.* supports the conclusion that Dr. McGinn's testimony should not be excluded wholesale. 447 F.3d 1096 (8th Cir. 2006). In *Robinson*, the Eighth Circuit affirmed a district court's decision to allow a neurologist to testify regarding "the likely type of injury one would sustain by the impact" and "the direction one would be forced in a rear-impact collision," in addition to the onset of shoulder pain within the expert's specialty. *Id.* at 1101. The Eighth Circuit explained "a physician with general knowledge may testify regarding medical issues that a specialist might treat in a clinical setting." *Id.* It follows

that a geotechnical and civil engineer can testify, at least to some extent, about ground-freeze systems designed and operated by specialists.[11]

And Keller has not explained why geotechnical and civil engineering standards do not apply to ground-freeze systems, nor has it identified specific, critical knowledge Dr. McGinn lacks.  For example, in *Mattke v. Deschamps*, the plaintiff's expert in sleep disorders and pulmonology (a specialty relating to respiratory conditions) was not qualified to testify about the actions of Mayo Clinic's pathology department to prevent contamination by cellular floaters.  374 F.3d 667, 671–72 (8th Cir. 2004).  There, the expert testified he was not familiar with cellular floaters, did not know how often they occurred, and did not know what measures modern pathology laboratories took to avoid floaters.  *Id.* Dr. McGinn's experience here is not a completely unrelated specialty—he is a qualified civil and geotechnical engineer, essentially the same education as Dr. Alan Auld, Keller's ground-freeze expert.   Unlike a sleep-disorder and pulmonary physician opining on laboratory procedures to prevent a phenomenon the expert testified knowing nothing about, it is reasonably within Dr. McGinn's expertise to apply, for example, geotechnical and civil engineering principles of data verification to Keller's ground-freezing operation.

---

[11]    There is another concern.  "Keller is one of a few companies in the USA that regularly performs ground freeze engineering work."  ECF No. 80 at 5.  Following Keller's rationale, only ground-freeze engineers with industry experience could testify about Keller's negligence.  "[T]o require the degree of specificity [Keller proposes comes] close to letting that industry indirectly set its own standards."  *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 82 (2d Cir. 1997); *cf.* 29 Charles A. Wright & Victor J. Gold, *Federal Practice and Procedure: Evidence* § 6264.2 (2d ed. Apr. 2023 Update).

To the extent this is a close call, it is resolved by the parties agreeing to a bench trial. "The main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony." *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011). For this reason, courts "relax *Daubert*'s application for bench trials." *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012). The better answer is to decide what weight to give Dr. McGinn's opinions, if any, at trial.

B

ECI moves to exclude, in part, expert testimony of Dr. Alan Auld. ECF No. 70. Dr. Auld received his Honours Degree in Applied Science (Civil Engineering) from the University of Durham, and a Ph.D. in Civil Engineering from the University of Newcastle upon Tyne. ECF No. 74-1 at 22. He is a fellow of the Institute of Materials, Minerals and Mining, and was a licensed Canadian Professional Engineer before retiring. *Id.* Dr. Auld has more than forty years of experience "within the field of construction, particularly the design of deep mine shafts, tunnels and underground mine development works." *Id.* In his career, he has worked on 18 projects employing artificial ground-freezes and has 16 publications on the topic of ground freezing. *Id.* at 24–25.

Dr. Auld offers several opinions, including: (1) "Keller's Ground Freezing Proposal clearly set out the terms under which its business was to be carried out in accordance with generally-accepted standards and principles that govern professional engineers," ECF No. 74-1 at 16; (2) "Keller's work was completed in accordance with the Contract," *id.*; (3) ECI's failure to seal the circumferential cut, relief slot, and dirt wing prior to carrying out welding "caused the melting of the frozen ground above the tunnel roof at the extremity

of the frozen ground and allowed the groundwater and sand to enter the tunnel through the unsealed openings," *id.* at 17; (4) "the work carried out inside the tunnel using heat activities, and the use of heaters, including the welding to install the jack at 12 o'clock could be the main contribution in causing the flood event," *id*. at 97; (5) the MTBM "was concreted in" by ECI grouting the area around the MTBM head, *id.* at 14; (6) "ECI hung a thin sheet of polyurethane like a drape at the end of the Trailing Can, which was not sufficient insulation to prevent the heat from passing down the tunnel," *id.* at 6; (7) in his rebuttal report, Dr. Auld opined "ECI had a duty of care under the Subcontract to provide the necessary information for Keller," and "[t]he failure of ECI to pass on proper written instructions to Keller constitutes a breach of 'duty of care' by ECI," *id.* at 115–16; and (8) Keller's scope of work on the Project was to provide a ground-freeze, "Keller did not guarantee that ECI would recover the MTBM—that was ECI's scope of work," *id*. at 5.

(1) ECI seeks to exclude Dr. Auld's supplemental report. On September 14, 2023, Keller sent a copy of Dr. Auld's supplemental report to ECI, a report that contained additional calculations to support his opinions. ECF No. 74-1 at 483–84; ECF No. 86-1 at 15–23. There is no dispute that Dr. Auld's supplemental report was written and disclosed after the deadlines for expert discovery had passed. *See* ECF No. 55. [12]

Federal Rule of Civil Procedure 26(a)(2) requires the timely disclosure of supplemental expert testimony. *See also Wegener v. Johnson*, 527 F.3d 687, 691 (8th Cir.

---

[12]    Initial expert reports were due on June 1, 2023. ECF No. 55 at 1. Rebuttal expert reports were due on July 14, 2023. *Id.* Expert discovery, including depositions, was to be completed on or before August 18, 2023. *Id.* at 2.

2008).  "Since failure to disclose in a timely manner is equivalent to failure to disclose," *Trost v. Trek Bicycle Corp.*, 162 F.3d 1004, 1008 (8th Cir. 1998), Rule 37(c)(1) provides the applicable standard: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  *See* Fed. R. Civ. P. 37(c)(1).  Therefore, the supplemental report may be excluded "as a self-executing sanction unless the party's failure to comply is substantially justified or harmless."  *Wegener*, 527 F.3d at 692.  Courts have outlined four factors to consider in determining whether a failure to disclose was substantially justified or harmless: "(1) the importance of the excluded material; (2) the explanation of the party for the failure to comply with the disclosure rules; (3) the potential prejudice from allowing the material to be used at trial; and (4) the availability of a continuance to cure such prejudice."  *PUR Water Purification Prods. v. Brita Prods. Co.*, No. 99-cv-749 (PAM/JGL), 2001 WL 392026, at *1 (D. Minn. Mar. 14, 2001) (Magnuson, J.) (citing *Citizens Bank v. Ford Motor Co.*, 16 F.3d 965, 966 (8th Cir. 1994)); *see also Mathers v. Northshore Mining Co.*, 217 F.R.D. 474, 482–83 (D. Minn. 2003); *Wegner*, 527 F.3d at 692.

The first factor is the importance of the excluded material.  In his supplemental report, Dr. Auld provides calculations on three topics: how fast water flowed into the tunnel, the force required to stop the incoming water, and grout bond resistance.  ECF No. 86-1 at 15–23.  The first two sets of calculations purport to show that if ECI personnel were monitoring the MTBM when the leak started, they could have stopped the flood event or

exited safely. *Id.* at 16. The grout bond resistance calculations purport to show ECI was unable to jack the MTBM into the retrieval shaft because it was cemented in place. *Id.* The parties do not explain how, or if, these calculations are important. Considering the calculations do not relate to the success or failure of the ground-freeze, and a second expert for Keller (Paul Wilkinson) opines that the MTBM was cemented in place, it suffices to say Dr. Auld's supplemental report does not seem critical.

The second factor is Keller's justification for the late supplemental report. Keller explains only that "[Dr.] Auld expressly reserved the right to supplement his analysis." ECF No. 85 at 14. This does not allow Keller to ignore discovery deadlines. Dr. Auld appears to have supplemented his report in response to deposition questions, rather than in response to new information. *Id.* at 15; ECF No. 86-1 at 15. Fixing flaws exposed at a deposition is not a valid justification for a late supplemental report. *See Petrone v. Werner Enters., Inc.*, 940 F.3d 425, 434–36 (8th Cir. 2019). Dr. Auld's report is not a justifiably late response to an opposing party's late expert disclosure, *PUR Water*, 2001 WL 392026, at *2, or the result of reviewing new documents disclosed after the close of discovery, *Bison Advisors LLC v. Kessler*, No. 14-cv-3121 (DSD/SER), 2016 WL 3525900, at *10 (D. Minn. Jan. 21, 2016). Because Keller provides no valid justification for Dr. Auld's late supplemental report, this factor strongly supports exclusion.

The third factor is prejudice. In *Jackson v. Allstate Insurance Co.*, a late disclosure of a supplemental report was harmless, not prejudicial. 785 F.3d 1193, 1203–04 (8th Cir. 2015). There, the plaintiff fully deposed the defendant's expert with respect to a late field study and never requested a supplemental deposition. *Id.* at 1204. Not so here. ECI

already deposed Dr. Auld, and Dr. McGinn disclosed a timely rebuttal report.  ECI has been prejudiced by losing the opportunity to depose Dr. Auld and provide rebuttal expert testimony regarding the new information in Dr. Auld's supplemental report.  Moreover, if considered, Dr. Auld's supplemental report would affect ECI's pending motion to exclude Dr. Auld's testimony.  This prejudice supports exclusion.

The fourth factor is the ability to cure the prejudice.  In *Lenzen v. Garon Products, Inc.*, Judge Nelson declined to strike late expert affidavits, instead requiring a plaintiff to make the experts available for two hours of additional deposition time.  No. 09-cv-2893 (SRN/AJB), 2012 WL 1392525, at *6 (D. Minn. Apr. 23, 2012).  Allowing ECI to further depose Dr. Auld and permitting Dr. McGinn to supplement his rebuttal report might cure the prejudice to ECI.  This possibility weighs against exclusion.  But because Keller provided no valid justification for Dr. Auld's late supplemental report and the contents are not critical to Keller's case, the supplemental report's late disclosure is not substantially justified or harmless and will be excluded.  Dr. Auld may not testify about the contents of the supplemental report at trial, nor will it be considered when deciding ECI's motion to exclude Dr. Auld's expert testimony.

(2) Dr. Auld's expert testimony that heaters contributed to the flood event will be excluded.  *Daubert* requires "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  *Daubert*, 509 U.S. at 592–93.  "Generally speaking, an expert's methodology should be deemed reliable when that expert derives her courtroom opinions using the same level of rigor that characterizes

practice in the relevant field of expertise." 29 Charles A. Wright & Victor J. Gold, *Federal Practice and Procedure: Evidence* § 6268.1 (2d ed. Apr. 2023 Update). Courts typically exclude expert testimony when an expert fails to identify any methodology. *Ahlberg v. Chrysler Corp.*, 481 F.3d 630, 635 (8th Cir. 2007); *Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 460 (7th Cir. 2019); *Koken v. Black & Veatch Const., Inc.*, 426 F.3d 39, 47 (1st Cir. 2005).

Dr. Auld's opinion that the heaters caused the flood event is not supported by reliable principles and methods. In his deposition, Dr. Auld testified he used "[n]o scientific methodology," stating his conclusions are based on "the fact that [ECI] used the heater and the flooding occurred." ECF No. 74-1 at 321 (Auld Dep. 158:14–16). Dr. Auld did not perform any calculations to reach his conclusion that heaters caused the flood event, *id.* at 321 (Auld Dep. 158:4–7), or consider any alternative possible causes, *id.* 307 (Auld Dep. 144:19–22). Without identifying any reliable principles or methods, Dr. Auld's expert opinion that the heaters caused the flood event will be excluded.

Keller counters that "a witness who is qualified as an expert by his knowledge, skill, experience, training, or education may provide testimony in the form of an opinion." ECF No. 85 at 4. This ignores the problem. Under Rule 702, expert qualifications are a necessary—but not sufficient—predicate to admissibility. *See, e.g.*, *Polski v. Quigley Corp.*, 538 F.3d 836, 839–40 (8th Cir. 2008). As the Eighth Circuit explained in *Marmo*, "the proponent of the expert testimony must show by a preponderance of the evidence *both* that the expert is qualified to render the opinion *and* that the methodology underlying his conclusions is scientifically valid." 457 F.3d at 757–58 (emphasis added). Dr. Auld's

heater opinion fails to meet the latter requirement.  Keller further argues that because in *Bonner v. ISP Technologies, Inc.*, "it was not necessary that [plaintiff's] experts quantify the amount of [product] to which she was exposed," Dr. Auld does not need to calculate "the exact amount of temperature of the heat ECI applied to the freeze in the tunnel." 259 F.3d at 931.  Fair enough.  Dr. Auld did not need to calculate the exact number of kilojoules generated by the heaters for his testimony to be admissible—a variety of principles or methods could have been sufficiently reliable.  The problem is that Dr. Auld has not explained what principles and methods, if any, he relied upon.  In *Bonner*, the court explained "the district court carefully reviewed Dr. Martinez's methodology and concluded that it was sufficiently reliable." *Id.* at 930.  Here, there is no such methodology to examine.

(3) Dr. Auld's grouting opinion will be excluded for the same reason.  Once again, Dr. Auld did not perform any calculations or analysis to conclude ECI's grouting near the retrieval shaft prevented the MTBM from advancing.  ECF No. 74-1 at 430 (Auld Dep. 267:12–16).  The basis for his conclusion was "[j]ust the fact that it's grout.  It's cement." *Id.* at 432 (Auld Dep. 269:8–14).  He did not consider the volume of grout, *id.* at 432 (Auld Dep. 269:3–7) or the composition of the grout, *id.* at 430 (Auld Dep. 267:2–6), when reaching his conclusion.  For the same reasons discussed above, his opinion that grout prevented the MTBM from advancing into the retrieval shaft will be excluded because it is not the product of reliable principles and methods.

(4) Dr. Auld's opinion that ECI's insulation was insufficient to contain the heat will be excluded on familiar grounds.  When asked for the basis of this opinion, Dr. Auld responded "no calculation or scientific validation.  Just an opinion." ECF No. 74-1 at 415

(Auld Dep. 252:11–17).  He did not provide any methodology for his opinion, instead explaining the opinion was "[j]ust observation of the statement," from "[r]eading the description of what [the insulation] was."  *Id.* at 415–16 (Auld Dep. 252:18–253:1).  For the same reasons discussed above, Dr. Auld's opinion lacks reliable principles and methods.

(5) Dr. Auld's opinions regarding ECI's communications with Keller must be parsed more carefully.  "Matters of law are reserved exclusively for the Court."  *Taqueria El Primo LLC v. Ill. Farmers Ins. Co.*, 577 F. Supp. 3d 970, 987 (D. Minn. 2021) (citing *S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003)).  For this reason, expert testimony on legal issues is inadmissible.  *S. Pine Helicopters*, 320 F.3d at 841.  Because the interpretation of an unambiguous contract is a matter of law, "[e]xperts may not testify to the meaning of a contract where the language is unambiguous."  *In re ResCap Liquidating Tr. Litig.*, 432 F. Supp. 3d 902, 923 (D. Minn. 2020).  And an expert may not opine on a party's duties under a contract, because a duty is a question of law.  *See The Shaw Group, Inc. v. Marcum*, 516 F.3d 1061, 1068 (8th Cir. 2008).  Even when a contract is ambiguous, "an expert may not simply offer their personal opinion about a contract's meaning or applicability."  *In re ResCap*, 432 F. Supp. 3d at 923.  However, experts may opine on industry standards, *S. Pine Helicopters*, 320 F.3d at 841, and (if relevant) "how a reasonable industry participant would view certain contractual provisions or clauses."  *In re ResCap*, 432 F. Supp. 3d at 923 (citing *Kruszka v. Novartis Pharm. Corp.*, 28 F. Supp. 3d 920, 931 (D. Minn. 2014)).

Here, Dr. Auld contends there is a duty of care in the following provision of the Subcontract: "Communications.   Contractor understands the importance of good communications and will (i) give Subcontractor the notice to proceed, (ii) keep Subcontractor informed of scheduling changes, and (iii) respond timely to Subcontractor's questions and concerns." ECF No. 62-1 § 3(a).   More specifically, Dr. Auld agreed in his deposition that his "opinion is that the phrase 'Contractor understands the importance of good communications' is a freestanding obligation on ECI to inform Keller of certain things." ECF No. 74-1 at 366 (Auld Dep. 203:10–16).   It follows from *The Shaw Group* that Dr. Auld may not testify about ECI's duties under the contract. 516 F.3d at 1068 ("The court properly excluded any expert testimony as to Shaw's duty under the contract, permitting [the expert witness] to testify only as to the ordinary business practices of those engaged in private contracting with the military.").   And Keller does not expressly contend this provision is ambiguous, explain how the provision is ambiguous, or "suggest that the ambiguity involves terms of art or unique industry practices that Dr. [Auld] must explain to a [factfinder] based on his specialized knowledge or experience." *Fair Isaac Corp. v. Fed. Ins. Co.*, 447 F. Supp. 3d 857, 873 (D. Minn. 2020).   In other words, Dr. Auld's opinion that the Subcontract included a duty of care requiring ECI to effectively communicate with Keller is an impermissible personal opinion on the Subcontract's meaning.   And it follows that Dr. Auld may not opine that ECI breached such an alleged contractual duty.   However, Dr. Auld's remaining testimony about ECI's lack of communication is not excluded here.   For example, this includes why it is important, based

on Dr. Auld's industry experience, for a general contractor to provide a method-statement or other information to a ground-freeze subcontractor.

(6) ECI seeks to exclude Dr. Auld's opinion on the parties' scope of work under the Subcontract. ECF No. 72 at 26–27.

The scope-of-work provision in the Subcontract states:

> Subcontractor agrees to provide all labor, materials, services, and equipment to perform the following scope of work on the Project: Wisconsin PE Design of frozen soil system for temporary ground stabilization and ground water control. The installation and oversight of the ground freeze system in accordance with Subcontractor's proposal dated October 6, 2020, attached hereto as Exhibit A. The Drilling and installation of ground freeze pipe (including furnishing of pipe) is the responsibility of Contractor.

ECF No. 74-1 at 28. Dr. Auld's scope of work opinions run into the same problem as his duty of care opinions—experts may not testify on matters of law. *S. Pine Helicopters,* 320 F.3d at 841. The parties' scope of work is defined by the Subcontract, and the interpretation of that Subcontract is a matter of law. *See Winthrop Resources Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 470 (8th Cir. 2004) ("If [a] contract is unambiguous, the interpretation is a question of law" and "the court cannot consider anything other than the contract." (citations omitted)). Keller does not contend the scope of work clause is ambiguous or that Dr. Auld's expertise helps resolve such ambiguity.

Instead, Keller contends that "[w]hen experts are 'trained by experience and intimately familiar with the types of contracts . . . at issue,' they may testify if their opinions on the contract at issue 'are limited to [their] understanding of normal industry practices and customs with respect to contract provisions like the clause[s] at issue, as well as how

38

a reasonable industry participant would view certain contractual provisions or clauses.'" ECF No. 85 at 14 (citing *In re ResCap*, 432 F. Supp.3d at 923). *In re ResCap* is not analogous. There, Judge Nelson allowed an expert underwriter to opine (narrowly) on certain representations and disclaimers in mortgage loans. *Id.* at 923. To conclude loans contained material underwriting defects, the expert in *ResCap* evaluated the loans to determine whether they "(a) were likely to be repaid and were supported by adequate collateral when initially evaluated; (b) complied with the documentation requirements for the borrower's credit profile; (c) fulfilled hazard and title insurance requirements; and (d) complied with various contractual and legal requirements, such as various disclosure requirements under federal statutes and anti-predatory lending requirements under state statutes." *Id.* at 920. In other words, the expert's opinions "of normal industry practices and customs with respect to contract provisions" were a predicate to the expert's principal opinions regarding underwriting defects. *See In re ResCap*, 432 F. Supp. 3d at 921–23. By contrast, Dr. Auld only opines directly on ECI and Keller's scope of work, he does not offer any opinions on normal industry practices and customs with respect to scope-of-work provisions in ground-freeze subcontracts. Nor does the record demonstrate Dr. Auld has experience with ground-freeze contracts, unlike the expert underwriter in *ResCap*. And to the extent Dr. Auld's opinion does "not render a legal opinion on the contract language," but instead opines according to principles that govern professional engineers, *see* ECF No. 85 at 14, Keller does not explain how such an opinion is helpful when the parties' scope of work is governed by the Subcontract.

C

ECI also moves to exclude the expert testimony, in part, of Erin Fallon. Fallon is Keller's damages expert retained to refute ECI's damages expert (HKA). She has a B.S. in Chemical Engineering from the University of Pittsburgh and over twenty years of experience in "expert consulting and project advisory services for clients in the engineering and construction industries." ECF No. 74-1 at 547. In her work, "[s]he regularly focuses on schedule delay and disruption analysis, loss of productivity, and cost damages quantification issues, and participates in various phases of claims management and litigation." *Id.*

Fallon lists sixteen expert opinions in her rebuttal report. The upshot of Fallon's opinions is that ECI's expert HKA failed to perform adequate analysis, failed to account for important facts, and relied on incorrect assumptions. ECF No. 74-1 at 516–19. ECI seeks to exclude statements near the end of Fallon's report and opinions expressed during her deposition. In her report, she opined that "HKA failed to substantiate ECI was actually assessed liquidated damages," *id.* at 543, and at her deposition she testified "I don't think it's appropriate to assert a claim unless you incurred the cost. . . . [M]y opinion is that at first you need to establish that those liquidated damages were incurred as a result of Keller's failure, and two, that you actually incurred and paid those costs," *id.* at 630 (Fallon Dep. 202:12–21). Fallon also opined "HKA and ECI failed to establish or substantiate any allegation that the Flood Event . . . was the result of Keller's defective or malfunctioning equipment." *Id.* at 538.

40

(1) Fallon's opinion on the appropriateness of ECI's claim for liquidated damages will be excluded. "Matters of law are reserved exclusively for the Court." *Taqueria El Primo*, 577 F. Supp. 3d at 987 (D. Minn. 2021) (citing *S. Pine Helicopters*, 320 F.3d at 841). And whether a category of damages is available is a matter of law. *See, e.g.*, *Barr/Nelson, Inc. v. Tonto's, Inc.*, 336 N.W.2d 46, 52 (Minn. 1983). Keller counters that "[a] damage expert's job is to opine on what damages are available. . . . Fallon applied the methodology . . . and concluded that ECI is not entitled to liquidated damages." ECF No. 85 at 19. Not so. Damages experts "must make assumptions about liability and the parties' legal theories in order to calculate damages." *Mahaska Bottling Co., Inc. v. PepsiCo, Inc.*, 441 F. Supp. 3d 745, 758 (S.D. Iowa 2019). Calculating damages based on legal assumptions is not the same as "directly opining on the validity of the party's underlying legal theories." *Id.* at 757. Fallon's opinion that "it's not appropriate to assess liquidated damages," ECF No. 74-1 at 630 (Fallon Dep. 202:4–13), is based on her "opinion . . . that at first you need to establish that those liquidated damages were incurred as a result of Keller's failure, and two, that you actually incurred and paid those costs," *id.* (Fallon Dep. 202:12–21). Opining on the appropriateness of liquidated damages in this context is a legal, not factual, opinion. "[Q]uestions of law are the subject of the court's instructions and not the subject of expert testimony." *United States v. Klaphake*, 64 F.3d 435, 438–39 (8th Cir. 1995) (quoting *United States v. Vreeken*, 803 F.2d 1085, 1091 (10th Cir. 1986)).

(2) ECI also seeks to exclude Fallon's opinions about the Subcontract's meaning. ECF No. 72 at 31. More specifically, it seeks to exclude Fallon's opinion that HKA and ECI failed to establish that the flood event was the result of Keller's defective or

malfunctioning equipment. *See* 74-1 at 538. Keller, as the proponent of the expert testimony, "must prove its admissibility by a preponderance of the evidence." *Lauzon*, 270 F.3d at 686; Fed. R. Evid. 702. However, Keller did not respond, waiving its objections to ECI's motion. *See Hernandez-Diaz v. Equifax Info. Servs.*, No. 22-cv-2302 (JRT/JFD), 2023 WL 2025123, at *2 (D. Minn. Feb. 15, 2023). Regardless, Fallon's opinions on this subject would not be helpful because courts are well-equipped to interpret contracts and evaluate the sufficiency of the evidence.

D

Finally, ECI moves to exclude the expert testimony, in part, of Paul Wilkinson. Wilkinson has a Higher National Degree in Engineering Surveying from Nottingham Trent University. ECF No. 74-1 at 641. He is a microtunneling expert with over 30 years of experience "with the procurement, installation and close-out on over 200 microtunneling and pipe jacking projects." *Id.* Wilkinson has overseen more than 100 kilometers of trenchless tunnel construction in over 25 countries. *Id.* He is currently a senior consultant at Kilduff Underground Engineering, Inc., where he provides engineering and construction consultation for microtunneling and pipe jacking projects. *Id.*

Wilkinson offers a rebuttal report to Dr. McGinn's expert report. In Wilkinson's report, he opines: (1) given the conditions of the Project, the microtunneling drive should only have been "undertaken by a recognized and experienced Microtunnelling Contractor," ECF No. 74-1 at 635, and because ECI did not have sufficient microtunneling experience they "were always likely to have problems" with such a complex project, *id.* at 639; (2) ECI's microtunneling drive was not successful because the MTBM was out of alignment

42

with the reception seal, *id.* at 637; (3) ECI "did not effectively engage with [Keller] to address the proposed means and methods to rescue the MTBM," *id.* at 639; and (4) it was not possible for ECI to jack the MTBM into the retrieval shaft without removing the grout bond, *id.* at 640.

(1) ECI seeks to exclude Wilkinson's opinion about ECI's communications with Keller because "ECI's obligations in that regard are governed by a contract that Wilkinson didn't read." ECF No. 72 at 35. But ECI identifies no authority that requires an expert to review the contract to testify about industry standards or the importance of communication in a negligence case. And its reliance on *Teska v. Potlach Corp.* is not persuasive. 184 F. Supp. 2d 913 (D. Minn. 2002). In *Teska*, the court pointed out an expert's failure to review the operative contracts and subcontracts as part of a laundry list of problems with the expert's qualifications. *Id.* at 921 ("[The expert] did not review any other documents, manuals, handbooks, or regulations; he did not view the site of the accident; he did not review the operative contracts, and subcontracts; and he did not interview any of the witnesses himself. [The expert] conceded that he had not consulted any substantive texts, in forming his opinions in this case, and that he has relied solely upon his own past training and experience. . . . More importantly, the Record is bereft of any showing that [the expert] was personally aware of the construction practices of building contractors, particularly as they relate to the operation of a crane in Minnesota generally, or in northern Minnesota in particular."). By contrast, ECI does not challenge Wilkinson's microtunneling industry experience. And the "ordinary business practices of those engaged in [an industry]" is an admissible expert opinion. *The Shaw Grp.*, 516 F.3d at 1069.

ECI further contends, "Wilkinson also did not review any email communications between ECI and Keller and did not consider any of the deposition transcripts of ECI personnel." ECF No. 72 at 35. True. But Wilkinson reviewed Dr. McGinn's report and the communications embedded in Dr. McGinn's report. ECF No. 74-1 at 637–39. And "[a]s a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Larson v. Kempker*, 414 F.3d 936, 941 (8th Cir. 2005) (quotation omitted). Wilkinson's opinion that ECI should have communicated its rescue methods with Keller is not "so fundamentally unsupported that it can offer no assistance to the jury." *Id.* (quotation omitted). ECI's motion to exclude Wilkinson's communication opinions will be denied.

(2) ECI also seeks to exclude Wilkinson's opinion that "if the [recovery] plans had been discussed in detail with Keller throughout, then some of the issues that were had at the end of the project with the flooding may never have materialized." ECF No. 74-1 at 823 (Wilkinson Dep. 179:20–24). "Expert testimony that is speculative is not competent proof." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000). For example, in *Werth v. Hill-Rom, Inc.*, the court excluded expert testimony as speculative because "the Report simply describes ways in which a chip *could have* broken free of the quartz tube and made its way to the bassinet; it is replete with possibilities and conjecture." 856 F. Supp. 2d 1051, 1061 (D. Minn. 2012). To ECI's point, Wilkinson is opining about what Keller *might* have done if provided with ECI's intended removal methods. However, Wilkinson explains the basis for his conclusion—ECI was "planning to leave the tunnel

44

structurally unsupported," ECF No. 74-1 at 824 (Wilkinson Dep. 180:1–2), and "[h]ad ECI been able to jack the MTBM forward[,] the unsupported ground would more than likely have collapsed with catastrophic consequences," *id.* at 640. Moreover, Wilkinson bases his opinion on Keller contacting ECI with concerns on January 20, 2021—after learning about ECI's plan to remove the MTBM without structural support but before the flood event. *Id.* at 639. In light of *Daubert*'s relaxed application for bench trials, *see David E. Watson*, 668 F.3d at 1015, Wilkinson's opinion is sufficiently supported so as to not be wholly speculative.

(3) Wilkinson's opinion that ECI's microtunneling drive was unsuccessful will be excluded. Rule 702 requires that evidence or testimony "help the trier of fact to understand the evidence or to determine a fact in issue." "This condition goes primarily to relevance." *Daubert*, 509 U.S. at 591. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* (quotation omitted). The condition of the MTBM at the retrieval shaft is relevant—at minimum as background information to the ground-freeze and MTBM retrieval efforts. But characterizing ECI's microtunneling drive as a success or failure makes no difference to Keller's breach-of-contract claim, ECI's negligence claim, or ECI's breach-of-contract claim. Keller counters that ECI "put the matter in issue when it alleged the success of its work it [sic] in its Counterclaim," and by including the statement in Dr. McGinn's report. ECF No. 85 at 22–24. That's beside the point. Dr. McGinn does not offer an expert opinion on the success or failure of the microtunneling drive—he includes only five specific opinions in his report. ECF No. 74-1 at 837–38. And a party's characterization of facts in a complaint does not render expert

testimony refuting that characterization relevant at trial. Keller further argues, "[w]hether ECI was qualified to self-perform the work on this project and whether its microtunnel drive under the river was 'successful' are all part of Keller's defense to ECI's counterclaims" and that "[t]hose questions are central to this case and to ECI's claims against Keller." ECF No. 85 at 24. But Keller does not elaborate how and why those questions matter. Wilkinson's expert opinion that ECI's microtunneling drive was unsuccessful will not help the trier of fact in this case.

(4) The same follows for Wilkinson's opinion that "ECI did not have the experience or qualifications to construct the tunnel and were always likely to have problems that could develop into major issues." ECF No. 74-1 at 639. The execution of the Subcontract and flood event both occurred after the MTBM became stuck at the retrieval shaft. The ground-freeze, not the micro-tunneling, is the central issue in this case. And although the actual conditions of the of the tunnel are relevant to the ground-freeze and MTBM retrieval, the likelihood of problems arising in ECI's microtunneling drive does not matter. Simply put, for Wilkinson to opine ECI was "always likely to have problems that could develop into major issues" is not helpful. Keller, as the proponent of the expert testimony, "must prove its admissibility by a preponderance of the evidence." *Lauzon*, 270 F.3d at 686; Fed. R. Evid. 702. It did not.

# ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.     Defendant and Counter-Claimant Engineering & Construction Innovations, Inc.'s Motion for Summary Judgment [ECF No. 59] is **GRANTED**.

2.     Plaintiff and Counter-Defendant Keller Industrial, Inc.'s Motion for Summary Judgment [ECF No. 64] is **DENIED**.

3.     Plaintiff and Counter-Defendant Keller Industrial, Inc.'s Motion to Exclude Expert Testimony of Dr. McGinn [ECF No. 77] is **DENIED**.

4.     Defendant and Counter-Claimant Engineering & Construction Innovations, Inc.'s Motion to Exclude Expert Testimony of Dr. Auld [ECF No. 70] is **GRANTED IN PART** and **DENIED IN PART** as explained in Part III.B., above.

5.     Defendant and Counter-Claimant Engineering & Construction Innovations, Inc.'s Motion to Exclude Expert Testimony of Erin Fallon [ECF No. 70] is **GRANTED**.

6.     Defendant and Counter-Claimant Engineering & Construction Innovations, Inc.'s Motion to Exclude Expert Testimony of Paul Wilkinson [ECF No. 70] is **GRANTED IN PART** and **DENIED IN PART** as explained in Part III.D., above.

Dated: January 18, 2024                          s/ Eric C. Tostrud
                                                 Eric C. Tostrud
                                                 United States District Court

47